CHARLES F. ANDERSON, Appellee, v. BOARD OF SUPERVISORS OF MONONA COUNTY et al., Appellants (and two other cases).

**DRAINS:** Establishment—Abuse of Discretion. It is beyond the discretionary power of the board of supervisors to establish a drainage improvement which (1) is of no substantial present value, (2) is admittedly incomplete, (3) will entail a heavy financial burden on the taxpayers, and possible confiscation, and (4) furnishes no assurance that benefits will equal assessments.

Headnote 1: 19 C. J. p. 637.

*Appeal from Monona District Court.*—C. C. HAMILTON, Judge.

MAY 10, 1927.

This is a consolidation of three appeals from the action of the board of supervisors of Monona County in establishing a drainage district. The district court vacated the establishment, and the defendants appeal.—*Affirmed.*

*Prichard & Prichard* and *George E. Allen,* for appellants.

*Jepson, Struble, Anderson & Sifford* and *Underhill & Miller,* for appellees.

MORLING, J.—The project is one for straightening Maple River. Its purpose is to control overflow and flood water, rather than merely to drain farm land. The main ditch as established is 67,000 feet in length. The cost estimated by the engineer is $122,855.30. The approximate assessable acreage is 6,869 acres. The estimated average cost per acre is $17.

The dubious character of the project as an improvement is, to a considerable extent, demonstrated by its history. A petition was filed in 1915. The engineer then appointed was Fairchild, who reported a cost of about $10 per acre. His plan was rejected, on the ground that the cost would exceed the benefits. In 1919, the present petition was filed. Carlson was appointed engineer. On June 28, 1920, he recommended the establishment of a district to include about 6,000 acres. The matter was, without

further action, recommitted to him, and on November 20, 1920, he filed an amended report, recommending a change of route. This report was not accepted; and on December 8, 1920, a third amended report was filed, recommending still another location. This was not accepted. On January 5, 1921, the board relieved Carlson, and appointed Oliver as engineer. On March 17, 1921, Oliver recommended the construction of a ditch which he said would not be sufficient to carry the water at the time of construction, but in a period of years would sufficiently increase in size by erosion. This report was not accepted. On May 6, 1921, Oliver filed a second report, recommending some change in location. This was not acted upon. On June 28, 1921, Oliver filed a second amendment, recommending a smaller ditch, of about one half of the distance proposed in his former report. This was rejected. On June 28, 1921, a district, upon the former recommendation of Oliver, at an estimated average cost of $25.30 per acre for all land within the district, was established. This plan provided for no laterals. The evidence is that it would have cost about $5,000 more to have provided the necessary laterals. The bottom width of the Oliver improvement was 24 to 26 feet. That of the one now under review is 18 feet. The carrying capacity of the Oliver ditch was 2,640 second feet. That of the one now before us is 1,180 second feet. An appeal was taken from the establishment of the Oliver ditch, and the establishment annulled, without prejudice to further proceedings. A new bond on the 1919 petition was filed, and the board appointed Moriarity engineer. Moriarity filed a report, March 5, 1924. A number of hearings were had. An amendment to the report was filed, and on June 20, 1924, the board, by a vote of two of the three members—one not voting—established the ditch. This is the establishment now before us. The advocates and opponents of the improvement appear to have frequently changed places, their attitude evidently depending largely on the location of the ditch.

Maple River is very crooked. The valley proposed to be improved, extending from the north line of Monona County to a point near the town of Castana, is very narrow. The distance between the bases of the hills on either side of the river is from one-half or three-fourths to one and one-half miles. The land subject to overflow is 1,500 acres. The character of the rest of the land in the district as respects drainage is not shown, further

than that Engineer Moriarity testifies that much of the soil is too wet and unfit for cultivation.; and the evidence shows that, during occasional floods, the water from the river has extended from hill to hill. The evidence is to the effect that no ditch would carry the water during such large floods. The evidence is also that about one half of the damage from flood water in the district is occasioned by the streams which flow into the valley from the adjacent hills. Engineer Oliver testified that there are about 25 different streams coming into the Maple River in the county, a number of which overflow some of the land, and 8 or 9 of which are taken care of by the Moriarity plan; that adding the cost of the necessary laterals would increase Moriarity's estimated cost to $145,000. Moriarity testifies that there is need of several other laterals, though the need is not as pressing as for those which he recommended. It is also in evidence that about $5,000 cost previously incurred is not included in the estimate. Some of the laterals recommended are not to enter the ditch, but discharge into the old river bed. The tendency will be for the old channel to fill.

The grade of the ditch now under consideration, according to Oliver, varies from 3.43 up to around 5 and a fraction feet per mile. Engineer Moriarity says that, for a distance of 3 miles about the center of the improvement, the fall is 3.23 feet per mile. The initial capacity of the ditch, as has been stated, is 1,180 second feet. The capacity of the present river is stated by Oliver to be about 900 second feet. According to Oliver:

"There is approximately 5,658 second feet of water delivered in the source of this improvement at a maximum discharge, and the maximum capacity of this ditch in question at that point is 1,180 second feet; and in a period of about ten years, this ditch would increase in size so that its carrying capacity would be approximately 5,658 second feet; and until that time occurred, the land in this district would be subject to overflow practically the same as it is now. A few minor overflows would be prevented. I know that the river has not overflowed to any extent since the flood of 1919."

The capacity of the Oliver ditch would have been 2,614 second feet. The required capacity for what are spoken of as ordinary flood conditions does not appear. Engineer Moriarity testifies:

"It is a well known fact that, with a channel this size, and fall available there, the ditch will grow to a certain definite size in a number of years, regardless of the size you build it. * * * In regard to the proposed ditch of Mr. Oliver, which is 24 to 26 feet in width at the bottom, it would be a matter of opinion as to how long the 18-foot ditch would take to reach the 24- to 26-foot size; but it is my opinion that in two years the 18-foot ditch would reach the 24- to 26-foot size, and reach its capacity within two or three years by natural erosion alone; and in my opinion, in from three to five years the 18-foot ditch would have the same carrying capacity as the 24- or 26-foot ditch would have. * * * The Maple Valley is subject to periodic overflow, and much of the soil is too wet and unfit for cultivation. It has very fertile soil. I believe that the plan I have outlined, if adopted, would be adequate to give a reasonable degree of security from floods, but it does not contemplate to carry all of the floods that came down there at the time of maximum flood; but reasonable protection against the ordinary flood and the laterals constructed would provide for the problem of the side streams. I do not claim that it would be complete, as furnishing whole protection from all floods; it is the intention to provide the best security at a reasonable assessment. I am fully convinced that it is a good business proposition. * * * It is my opinion that all of the land within the area would receive a benefit; the approximate redemption is only comparative. It will change the land from non-tillable pasture land and waste land or wood land into land that will be useful for crops. * * * In my report I state that the carrying capacity of the ditch would be double that of the river in its present condition, and that this would be greatly increased by erosion. * * * The fact that I crossed the river in this present ditch 49 or 50 times would tend to lessen the velocity of the water in the improvement. I planned to dam up the upstream end of the river cut-offs. The object of this is to prevent the river, following the old channel, and make it follow the new one * * * and, where a hill stream has its discharge in one of these bends of the river that is cut off, the old channel would have to be left open at one end * * * If the live streams running through them carried enough water to take out the silt that the high waters of the river would deposit, it would clean itself. If it didn't, it would finally fill up. * * * I had no objection to Mr.

Oliver's plan, other than the expense and the failure to take care of the hill streams. * * * I also ascertained that there had been three disastrous floods in the valley in 1912, 1915, and 1919; and I believe I understood in a general way that the maximum floods would be entirely beyond a reasonable expenditure to control. * * * Of course, a 26-foot bottom ditch would have a greater velocity and a greater cutting or erosion than would an 18-foot bottom ditch. That would be because you would have more water flowing through it. I think the present ditch would do its own cutting or enlarging in the first five years. After that, the cutting would be quite slow. * * * If the ditch was running full, and quantities of water coming down the hill streams emptying into abandoned beds of the river, it would fill the abandoned bed, and then have to go over the top somewhere; and during the time it was filling the abandoned bed, there would be a large amount of silt deposited, and that would frequently occur during flood stages. * * * I expect this ditch to run bank-full at some stages right on the start after it is constructed, and that it will continue bank-full until it reaches almost its maximum carrying capacity."

The estimates of the value of the land in the district vary from $100 to $250 per acre.

It would be impracticable to set out all of the evidence, and no useful purpose would be served by further references to it. We think it is obvious that the establishment of a ditch admittedly of little or no immediate value, and the incurring of such a large expenditure, with the conceded necessity of adding more laterals at an unknown cost, awaiting the conjectural action of the elements for an unknown period to complete the main improvement, no owner of the 1,500 acres of overflowed land having any reasonable assurance against confiscation, and no landowner in the district having any reasonable assurance that his land will be benefited to the amount of his proportion of the cost (even if it may be said he will be at all benefited), was beyond the legitimate exercise of the power of the board of supervisors. See *Focht v. Board of Supervisors,* 145 Iowa 130.

The judgment is—*Affirmed.*

EVANS, C. J., and DE GRAFF, ALBERT, and KINDIG, JJ., concur.